Staples, J.
delivered the opinion of the court.
The defendant in error, a gold broker in the city of New York, was employed, in the year 1867, by plaintiff in error, residing in the city of Richmond, to buy . and sell gold on commission. The speculation proved unfortunate, resulting in a loss to the latter of about *305 four thousand dollars. At the close of the transaetions between the parties, the defendant in error claimed a considerable balance to be due him, for the recovery of which a suit was instituted in the Circuit court of the city of Richmond, and at the February term, 1869, a verdict and judgment were rendered in his favor.
The plaintiff in error then moved the court to set aside the verdict and grant him a new trial, upon the ground of after discovered evidence; and he offered his own affidavit and that of Hamilton G-. Fant, in support of this motion. The facts set forth in defendant’s affidavit were, substantially, that the purchases and sales of gold with which plaintiff in error was charged, were fictitious and fraudulent; that the identical lots of gold alledged to have been bought and sold for plaintiff in error, were purchased and sold on account of various other persons, at the very same time; so that plaintiff in error was charged with commissions and losses on transactions which were not really for his benefit; and the knowledge of these facts only became known to him two days after the trial; that the names and residences of the witnesses by whom the facts could be proved, could not be ascertained by him before the trial, because the transactions took place in a distant city, where the witnesses resided, and that the-knowledge of these facts, and the names of the witnesses, were learned by him by means of an accidental interview with one of said persons after said trial.
The witnesses alluded to in this statement were not produced, nor were their affidavits read, nor even their •names given. It is stated, however, that the names of the witnesses and the facts relied on, were learned in an interview between plaintiff in error and one of said persons. Who that person is and why his affidavit was not taken and filed, we are not informed. The affidavit of Hamilton G-. Fant is in the record; and he states *306 that he had read the affidavit of plaintiff in error, and that he had reason to believe that if a new trial was ■ granted plaintiff in error, he would be able to establish the facts relied upon in regard to the purchases and sales of gold. "What these reasons are does not appear. "Whether founded on a knowledge of the facts or a mere inference from facts, we are left to conjecture. If this affiant had conversed with the witnesses in New York, it is a little remarkable he was not requested so to state. If he was one of the persons who had personal knowledge of the fraudulent conduct of the defendant in error, it is still more remarkable he did not state the facts. The cautious language employed by him would indicate that he was stating opinions rather than facts. Whatever he may have intended, no value or importance can be attached to an affidavit couched in such language.
On the trial of the cause, the plaintiff in error was himself examined as a witness. It appears from his testimony that as early as March, 1867, his suspicions of the defendant in error were awakened by certain evasive telegrams received from the latter; that these suspicions were strengthened by comparing these telegrams with others received from the same source by the witness Fant, from which it appeared that defendant in error was then professing to buy and sell at the very same time, the identical amounts of gold for said Fant, he was pretending to buy and sell for plaintiff in error. It is evident, from this statement, and from the affidavit of plaintiff in error, as also the certificate of the judge who presided at the trial, that the said Fant was one of the persons by whom plaintiff expected to establish the facts contained in his affidavit, and urged as a ground for new trial. It appears that the trial did not take place until February, 1869; •two years after the interview with Fant and the comparison between the telegrams; and yet Fant was not *307 examined as -a witness, nor is any reason given for the failure to do so; and the plaintiff in error gravely asks for a new trial to afford him an opportunity of examining a witness whose testimony was known to him two years before the former trial.
During all this time it does not appear that the plaintiff in error exercised the slightest diligence, or made any preparation for his defence, or effort to find or , procure the attendance of witnesses, notwithstanding his attention had been directed to the very facts now made the basis of an application for a new trial. But his negligence, after the trial, was equally glaring and palpable; and subjects him to the suspicion of attempting to obtain a new trial upon improper grounds.
The verdict was rendered on the 16th February, 1869. The affidavits of plaintiff in error and H. G-. Fant were made two days thereafter. The motion for a new trial was, however, not submitted until the 10th of March; nor was the bill of exceptions signed until the 15th of the month. During this period the plaintiff had ample opportunity to go to New York and take the affidavits of the witnesses whose names and residences he had ascertained on the 18th February; and thus shew to the court that he had discovered new and important evidence unknown before, which, upon a new trial, would establish, beyond controversy, the fraudulent conduct of his. agent. Instead of pursuing this plain and obvious course, he appears to have been content to trust his case to the court upon the unsatisfactory affidavits previously taken; or perhaps he was conscious of his inability to establish the facts upon which he founded his claim to the interposition of the court in his behalf.
To grant a new trial, under the circumstances here disclosed, is to violate well-settled principles of law; to offer premiums to negligent or fraudulent suitors to omit the exercise of proper diligence in prepai’ing *308 for tlie trial of eases. It is an established rule of the courts to grant new trials very rarely upon the ground ■ of after-discovered evidence, and never but under very special circumstances. The parly must simo he was-ignorant of the existence of the evidence, and it must be such as reasonable diligence on his part could not have seeur.ed at the former trial; that the new evidence is not of like import with, any part of that offered on the former trial. He must produce the affidavits of the witnesses, stating the facts they will testify, or, if that be impracticable, the affidavits of persons who have conversed with them, showing the facts they will state. On the other hand, a new trial will never be granted if it appear that the evidence might, with reasonable attention and diligence, have been procured before the first trial: nor where the affidavit states only that a person had told the party what he would say: nor where the evidence does not relate to new facts, but consists, merely of cumulative facts or circumstances relative to■ the same matter controverted at the former trial. Smith v. Brush, 8 Johns. R. 84; Shumway v. Fowler, 4 Johns. R. 425; Nuckols v. Jones’ adm’or, 8 Gratt. 278; Callaghan v. Kippers, 7. Leigh 608; 13 Gratt. 511.
It is objected, however, that the contract, which is the foundation of this action, is a mere wager, and void, as such, under the provisions of the Virginia statutes. I cannot perceive the force of this objection. By the very terms of the arrangement, the defendant in error,, in buying and selling the gold, could sustain no loss,, nor realize any profit from the transaction beyond his commissions, to which he was entitled in any event. "Whatever might happen, no damage or benefit could accrue to him from the adventure. If any profit resulted from the speculation, it belonged to the plaintiff" in error. If any loss accrued, he was to bear it. And I have yet to see a case in which it has been held that *309 a contract is a wager, by the terms of which the loss and profit were all on one side.
Another point relied upon in the argument is, that no sales and purchases of gold were in fact made; and the subject matter of such pretended purchases and sales had, at the time, no existence, actual or potential; and therefore, according to a well established principle of the law of sales, the contract in- relation thereto was void in law. In support of this position several cases were cited, in which it has been held, that if goods are sold, to be delivered at a future day, and the vendor neither has the goods at the time, nor has entered into any prior contract to buy them, nor has any reasonable expectation of receiving them by consignment, but means to go into the market and buy the goods he has eontracted to deliver, he cannot maintain an action on such contract. "Whether this principle be sound or not, it is unnecessary now to decide. It certainly has been repudiated by great judges, and is not regarded as law, according to the current of modern authorities. See 2 Parsons on Contracts, 543; Hibblewhite v. McMorine, 5 Exch. R. 462. This principle, however, can only apply to actions by the vendor against the vendee to recover damages for non-performance of the contract. It can have no application to a case in which an agency is established, and the agent is authorized to go into the market, purchase the goods, and sell them for the benefit of his principal. In such case, if the agent conforms to his instructions, and a loss is •sustained from the transaction, it would seem to be too •clear for argument, that the principal is bound to indemnify the agent for any loss he may sustain. As the agent is not permitted to reap any of the profits of his agency, he is entitled to be compensated for all expenditures and damage arising in the course of his employment.
In regard to the assertion, that no such purchases and *310 sales of gold were in fact made, the defendant in error states that all the transactions mentioned in his account of gold bought and sold for the defendant were ae^uaj> ¡)0na jige transactions, with other parties; and there is no evidence in the record contradicting this statement.
The last and only remaining point to be noticed, made by the counsel for the plaintiff in error, is that contracts for the sale of gold are illegal, because they are supposed to contravene considerations of public policy.-
The Congress of the United States has exclusive control of all questions appertaining to the currency. It has not deemed it advisable to adopt any legislation prohibiting the -purchase and sale of gold. On the contrary, the act of June, 1864, as amended by that of 1865, imposes a tax upon any sales or contracts for the sale of gold and other bullion and coin; and the act of March, 1863, provides that all contracts for the purchase or sale of gold or silver coin or bullion, if to be performed after a period exceeding three days, shall be in writing or printed, and signed by the parties or their agents. It would be a singular exercise of judicial power for the court to declare illegal, sales from which the government not only derives a revenue, but has actually defined the terms upon which those sales, shall be made under certain circumstances.
Independent of such considerations, the courts are-very averse to holding contracts illegal upon grounds-of public policy, unless the question is free from all doubt. In Hilton v. Eckersly, 6 Ellis. & Black. R. 47, the judges differed in opinion as to what public policy really was in the case then before them. Lord Campbell said he entered upon such considerations with much reluctance and great apprehension.
Bert, Ch. J., said he was not much disposed to yield to arguments of public policy: that the judges-had. *311 gone much farther than they were warranted in going, on such questions: that they had taken on themselves, sometimes, to decide doubtful questions of policy; and - they were always in danger of so doing, because courts of law look only at the particular case, and have not the means of bringing before them all those considerations which enter into the judgment of those who decide on questions of public policy. Judge Story has said that the courts have never really defined it. That it varies with the habits and fashions of the day, with the growth of commerce and the usages of trade. In the License Tax Cases, 5 Wall. U. S. R. 462, Chief Justice Chase said: “This court can know nothing of public policy, except from the constitution and laws, and the course of administration and decision.”
Whether purchases and sales of gold unduly affect the currency, and, if so, to what extent; whether the tendency of such transactions is to depress or stimulate values, are questions of political economy that address themselves chiefly to the legislative department. Their solution depends upon the laws and usages of trade and commerce, the course of legislation, the confidence of the people in the circulating medium, and the good faith and stability of the government, the state and condition of the country. There is nothing in this record, this court has no data, no facts before it, which enable it to declare that the business of buying and selling gold injuriously affects the currency, the trade or the morals of the country. We may indulge in speculative opinions upon the subject; hut it would he going very far to pronounce such transactions illegal, upon some vague and undefined notion that their tendency is to violate public policy. The eases cited, and others that might he referred to, justify no such conclusion.
The judgment of the court below is therefore affirmed.
Judgment affirmed.